**SENTRY INSURANCE, a Mutual Company, Plaintiff,**

v.

**J. C. LONGACRE and Melvin Stephens, Defendants.**

**Melvin STEPHENS, Plaintiff,**

v.

**J. C. LONGACRE, Defendant,**
**Sentry Insurance Company, a corporation, Garnishee.**

**Nos. CIV–74–351–B, CIV–74–512–B.**

United States District Court,
W. D. Oklahoma.

Oct. 31, 1975.

---

Tom L. King, King & Roberts and Earl D. Mills, Foliart, Mills & Niemeyer, Oklahoma City, Okl., for Sentry Ins.

Murray Cohen, Cohen & Pluess, Thomas W. Sullivan, Miskovsky, Sullivan & Miskovsky, and Don Porter, Oklahoma City, Okl., for Melvin Stephens.

BOHANON, District Judge.

The above-styled cases were consolidated for consideration, the earlier being an action for declaratory judgment filed by Sentry Insurance (CIV–74–351–B) and the later being a garnishment action filed by Melvin Stephens (CIV–74–512–B). There are but three genuine issues in the cases, all questions of law. First, what is the *res judicata* effect of a default judgment rendered in the District Court of Canadian County, Oklahoma? Second, what is the proper construction of insurance policy provisions which are in dispute? Third, what is the effect, through con-

struction of the document and evaluation of the undisputed facts, of the "Retail Order for a Motor Vehicle" executed between J. C. Longacre and Seltzer Chevrolet? A recitation of facts favorable to Stephens and Longacre is in order.

## I

### Documents of Sale

On May 14, 1969, J. C. Longacre went to the Seltzer Chevrolet dealership in Yukon, Oklahoma. Longacre dealt with Bill Tarrant, a Seltzer Chevrolet salesman and agent. The undisputed facts establish that Longacre desired to trade in his 1956 ½-ton Chevrolet panel truck on the purchase of a 1963 ½-ton pickup which was on the Seltzer lot. The dealership was to, and did, install a camper, four new tires and a rear bumper on the 1963 pickup. The exhibits and undisputed facts establish that four documents were promulgated during the trading, these four documents being filed with the Court by Sentry in conjunction with its Motion for Summary Judgment and being attached hereto as Appendices A, B, C and D. The first two documents (Appendices A and B) are notes or worksheets which refer to the terms of the trade and payments. The third document (Appendix C) entitled "CUSTOMER'S STATEMENT" sets out the family and credit particulars of J. C. Longacre. The fourth document (Appendix D) printed front and back and captioned "RETAIL ORDER FOR A MOTOR VEHICLE SELTZER CHEVROLET, INC." sets out various data: The Retail Order discloses Tarrant as the salesman; J. C. Longacre as the purchaser; is dated 5–14–69, and contains the printed phrase "PLEASE ENTER MY ORDER FOR THE FOLLOWING—USED—TRUCK." The Retail Order discloses a USED CAR ALLOWANCE OF $100; CASH WITH ORDER $60 and terms of one $40 payment on May 22, 1969, with payments of $49.96 starting on June 25, 1969.

The Retail Order contains the following declaration:

"Purchaser agrees that this Order includes all of the terms and conditions on both the face and reverse side hereof, that this Order cancels and supersedes any prior agreement and as of the date hereof comprises the complete and exclusive statement of the terms of the agreement relating to the subject matters covered hereby, and that *THIS ORDER SHALL NOT BECOME BINDING UNTIL ACCEPTED BY DEALER OR HIS AUTHORIZED REPRESENTATIVE.* Purchaser by his execution of this Order acknowledges that he has read its terms and conditions and has received a true copy of this Order." (emphasis in original)

The Retail Order evidenced the subsequent transfer of possession of the 1963 Chevrolet ½-ton pickup from Seltzer Chevrolet to J. C. Longacre. Soon after completion of the Retail Order, Seltzer Chevrolet proceeded to install the four new tires, the new rear bumper and the camper as specified in the Retail Order, and the vehicle was delivered to Mr. Longacre on May 16, 1969. Longacre then took the vehicle to his ranch and there continued to have possession and control of it. While the vehicle was in his possession, it is alleged that it was involved in the accident hereinafter described.

## II

### History of State Court Case

On May 30, 1969, at approximately midnight, Melvin Stephens was traveling to Watonga, Oklahoma, driving a Hertz rental car. Stephens was driving west on the Northwest Highway in Canadian County when his automobile collided with a horse owned by J. C. Longacre which Longacre was attempting to return to the corral from which the horse had escaped. Longacre thereafter failed to make payments due on the pickup described above, and Seltzer Chevrolet subsequently reacquired possession of the pickup truck.

Stephens thereafter filed suit against Longacre, Cause No. 69–129, District Court of Canadian County, State of Oklahoma.

On October 30, 1973, an attorney for Stephens delivered the following letter to Longacre, (Appendix E).

"Mr. J. C. Longacre
414 Yukon Avenue
Yukon, Oklahoma

Re: Melvin Stephens vs.
J. C. Longacre

Dear Mr. Longacre:

This letter confirms our agreement whereby the plaintiff, Melfin(sic) Stephens, by and through his attorney, agrees and binds himself to furnish you a release and satisfaction of judgment which will be filed in your behalf at no cost to you in the above styled cause of action in the event that the plaintiff is unable to make any collection of the judgment in this case from Sentry Insurance Company and/or Seltzer Chevrolet.

Sincerely yours,
/s/ Don Porter
DON PORTER, Attorney"

On November 9, 1973, Stephens' attorney appeared in the District Court of Canadian County and took default judgment against Longacre in the amount of $1,590,000.00. Journal Entry of Judgment was entered December 11, 1973, the District Court of Canadian County stating therein that Longacre had been using the 1963 pickup acquired from Seltzer to herd his horses along the way. Further, that the horses were being herded east in the westbound lane of the highway; that Longacre saw Stephens' automobile approaching, blinked the truck headlights and blew the horn and then "herded the horse into the windshield of the plaintiff (Stephens) causing him to receive a broken neck . . . ." and that Longacre was driving a pickup "belonging to Seltzer Chevrolet Company, Inc. of Yukon, Oklahoma. . . ."

Motions for orders in aid of execution against Sentry, as insurer of Seltzer Chevrolet, were then filed December 26, 1973. April 8, 1974, Sentry filed CIV–74–351 for declaratory judgment in this Court. May 6, 1974, Stephens filed Application for Specific Findings of Fact by the District Court of Canadian County, the Findings thereafter filed on May 15, 1974, stating in part:

". . . Sentry . . . appears . . . not as a party herein, but pursuant to discovery . . . to determine whether Sentry Insurance holds an equitable interest subject to execution inuring to the benefit of third party beneficiary Plaintiff herein, Melvin Stephens.

THE COURT FINDS:

. . . . . .

Canadian County Court

3. That said Sentry Plan Policy provided coverage for permissive users of motor vehicles.

4. That said Defendant, J. C. Longacre, was a permissive user under the terms of said policy.

. . . . . .

8. That Melvin Stephens, Plaintiff herein is a third party beneficiary under said contract of insurance.

9. That Sentry Insurance holds an equitable interest innuring (sic) to the benefit of Plaintiff herein, Melvin Stephens, pursuant to said contract of insurance."

Sentry filed, prior to the May 15 Findings of the District Court, a Petition for Writ of Prohibition in the Supreme Court of the State of Oklahoma. On June 19, 1974, the Supreme Court filed its Order, pertinent parts of which are hereafter set out:

"This action was originally commenced to have this court issue its writ . . . .. The gist of Petitioner's complaint was that it was not a party . . . ..

During the pendency of this matter . . . the judgment creditor in the

trial court proceeding commenced another action . . . the originally requested relief of the Petitioner has been rendered moot . . .. [T]he court is further advised that during the pendency of this matter in this court the Respondent entertained an application by the judgment creditor to enter 'findings of facts' regarding the liability of the Petitioner upon a policy of insurance. The Respondent entered such findings. A copy of them has been supplied us. Upon examination of those 'findings,' it appears that the trial court has exceeded its jurisdiction in that it has purported to determine questions involving substantive rights of the Petitioner in an action in which the latter was not a party and has not been accorded due process of law.

The Respondent's 'Findings of Fact By the Court' filed . . . on May 15, 1974, is hereby vacated, set aside and held for naught.

This cause is otherwise determined to have become moot and by reason thereof is dismissed.

DONE BY ORDER OF THE SUPREME COURT in conference this 17 day of June, 1974.

/s/ Denver N. Davison

CHIEF JUSTICE"

The other action which Stephens, the judgment creditor, had commenced as referred to by the Oklahoma Supreme Court was a garnishment proceeding. The garnishment was removed to this Court by Petition filed June 10, 1974 (CIV–74–351–B). Thereafter, Sentry filed an amended pleading alleging the state judgment to have been obtained by fraud and collusion. These facts, therefore, define the genuine issues.

### III

#### Res Judicata

■ It is clear that the "Findings of Fact" referred to by the Oklahoma Su-

preme Court present no barrier to the determination of this case. Nor, for that matter, does the original Journal Entry of Judgment which declared that Longacre "herded the horse into the windshield of the plaintiff" and that Longacre was driving a pickup "belonging to Seltzer Chevrolet," especially as Seltzer was never a party to suit in which the ownership of the truck was litigated. The instant suit is not between parties who all participated in the state court suit, and *res judicata* does not apply between cases involving different parties, *Lutes v. U. S. District Court for West. Dist. of Okl.*, 306 F.2d 948 (C.A.10, 1962), *cert. denied,* 371 U. S. 941, 83 S.Ct. 320, 9 L.Ed.2d 275 (1962). The instant suit is not merely a continuation of the suit initiated in state court. A garnishment action is a separate and independent suit after removal, *Adriaenssens v. Allstate Insurance Co.*, 258 F.2d 888 (C.A.10, 1958). Sentry became a party only upon commencement of the garnishment proceedings. The first issue, that of the *res judicata* effect of the default judgment and journal entry, is thus resolved to impose no limitation upon this Court in rendering summary judgment. This is especially so where the state court defendant receives a promise of release and satisfaction which results in a default judgment being taken.

### IV

#### Analysis of Comprehensive Policy

Policy No. 35–19400–01 was issued by Sentry to Seltzer Chevrolet to cover a period commencing in 1968 and terminating in 1971. Stephens' basic argument is that the provisions of this policy extended coverage to Longacre and thus inure to Stephens' benefit. This second issue requires a construction of the policy terms in order to determine the scope of coverage and whether Longacre was an insured. While the exact wording of the terms is critical, the plain meaning of the terms is equally important, *Resort*

*Car Rental Sys., Inc. v. Chuck Ruwart Chev., Inc.*, 519 F.2d 317, 320 (C.A.10, 1975). Section No. II of the policy provides for liability coverage. Section No. II consists of various types of liability coverage, the types being numbered sequentially by form number from SP/II–400 through SP/II–408. Forms SP/II–400, Comprehensive Liability Insurance, and SP/II–401, Umbrella Liability Insurance, provide the coverage in dispute. Form SP/II–400 declares in part:

"II PERSONS INSURED

Each of the following is an insured
. . . .

(1) the named insured;

. . . . . .

(3) with respect to the automobile hazard:

(a) any person while using, with the permission of the named insured, any automobile to which the insurance applies . . . provided his actual operation or . . . his other actual use . . . is within the scope of such permission . . . .

. . . . . .

None of the following is an insured:

. . . . . .

(iii) any person . . . other than the named insured, with respect to any automobile

(a) owned by such person . . – or

(b) possession of which has been transferred to another by the named insured pursuant to an agreement of sale;"

With respect to SP/II–400, was Longacre using the truck with the permission of the insured, or was he the owner or possessor pursuant to an agreement of sale?

### V

#### *Analysis of Umbrella Policy*

Whether Longacre is an insured under SP/II–401, Umbrella Liability Insurance, depends on limitations in part V, "Persons Insured," as well as the general scope of SP/II–401.

Form SP/II–401 declares in its part VIII, Conditions, that "this insurance" (umbrella liability) is "excess insurance" and that other parts of the policy are "underlying insurance."

Part III provides:

"The company shall be liable only for ultimate net loss resulting from any one occurrence in excess of either

(a) the amounts of the . . . underlying insurance . . . or

(b) if the insurance afforded by underlying insurance is inapplicable to the occurrence, the amount stated in the declarations as the retained limit," (which is declared in the amended declarations endorsement of 9–10–69 to be $10,000)

Since the retained limit may apply if the underlying insurance is inapplicable to the occurrence, the scope of SP/II–401 turns on persons falling within Part V PERSONS INSURED:

"The unqualified word 'insured' includes the named insured . . . and any subsidiary company of the named insured . . . and also includes to the extent set forth below:

. . . . . .

3. Any executive officer, partner, employee or member of their family or member of the family of the named insured, if an individual while using an owned automobile provided the actual use of the automobile is by the named insured or with his permission . . . ."

Stephens contends that the ambiguity of No. 3 above grants coverage to Longacre. Such a result as contended for would do violence both to the English language and the plain meaning of the entire section, "PERSONS INSURED," which, in its introductory paragraph includes the named insured and any subsidiary company thereof. Sub-part 1 includes executive officers, directors, partners, etc. Sub-part 2 refers to organiza-

tions, trustees or persons for whom the named insured must provide coverage but only with respect to named insured's operations or facilities of the named insured. Sub-part 3, quoted above, does no more than to extend coverage to the families of the named insured and its officers, employees and partners if one of these in such relation to the named insured is an individual, whether the individual is operating an owned or a hired automobile and if with permission.

The language of Sub-part 3 is sufficiently clear in stating that those in no relation, corporate or family, to Seltzer Chevrolet are not afforded coverage. It is patently absurd and wholly without merit to deduce that any lack of clarity opens every door to every claimant.

In cases cited by Stephens in aid of his Motion, such as *Conner v. Transamerica Insurance Company*, 496 P.2d 770 (Okl.1972) and *State Farm Mutual Automobile Insurance Co. v. Holloway*, 423 F.2d 1281 (C.A.10, 1970) Stephens overlooks a proposition inherent in the rule that ambiguous phrases are resolved in favor of the insured. What is overlooked is that there is a distinction between ambiguous phrases covering a named insured and ambiguous phrases which a third party seeks to take advantage of. The third party, in seeking to take advantage of a clause like SP/II–401 must at least bring himself within the objects to be accomplished by the policy. There must be some relation or nexus between the third party and the offending ambiguity. A reference to the entire "PERSONS INSURED" section of SP/II–401 clearly reflects its purpose, such purpose not being to insure all individuals. The contested language of No. 3 above is clear enough. This matter is significantly analogous to that presented in *Universal Underwriters, Ins. Co. v. Bush*, 272 F.2d 675, 678 (C.A.10, 1959) and the same rationale applies.

In support of his Motion for Summary Judgment, Stephens makes one alternative argument. That is, that Sub-part 3 "provides coverage for an individual, provided that individual is driving an automobile belonging to the named insured with his permission." This proposed interpretation resolves itself into the same question which is raised by SP/II–400; i. e., whether Longacre was a permissive user, or the owner of the vehicle or possessor pursuant to an agreement of sale.

The remaining issue under SP/II–400 and SP/II–401 relates to this permissive use or sale.

## VI

### *Analysis of Retail Order and Papers*

Only if Longacre was a permissive user would coverage be provided. As stated *supra*, the *material* facts surrounding the events argued to be a sale are not disputed. Additionally, the state of the law is such that it is clear and not open to significant dispute that a sale or transfer of possession pursuant to a sale did arise from the Longacre-Seltzer Chevrolet trading.

As a matter of threshold reasoning, when possession of a vehicle which has been modified to suit a prospective purchaser's desires is given by a dealer's salesman, with a vehicle traded in and money changing hands, and a Retail Order signed and accepted by the parties, there is evinced, in the spirit of the law merchant, at least a change of possession pursuant to an agreement of sale. More legalistically, the Retail Order states:

"Purchaser agrees that this Order includes all of the terms and conditions . . . that this Order . . . comprises the complete and exclusive statement of the terms of the agreement . . . and that *THIS ORDER SHALL NOT BECOME BINDING UNTIL ACCEPTED BY DEALER OR HIS AUTHORIZED REPRESENTATIVE.*"

The Retail Order was signed by an undisputedly authorized representative of Seltzer. By its terms, the Retail Order is an agreement. Were the Order merely an offer, the money received, the modifications made and the change of possession can only show an acceptance. The Retail Order was the bargain of the parties in fact as found from their language, 12A Okla.Stat. § 1–201.

The Retail Order further states:

"Purchaser agrees that this Order includes all of the terms and conditions on both the face and reverse side hereof . . . and . . . comprises the complete and exclusive statement of the terms of the agreement . . . ."

and falls within 12A Okla.Stat. § 2–202:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein *may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement* but may be explained or supplemented

(a) . . .

(b) by evidence of *consistent* additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the agreement." (emphasis added)

Thus, the agreement speaks for itself by force of law. Conclusory statements of "yes, there was a sale," and, "no, there was no sale," have no effect where the acts and written agreement of the parties belie such words. Such statements cannot contradict the written agreement of the parties. Where the writing is clear, unambiguous, evinces the complete and entire agreement of the parties and is thus binding by law, then a factual question promulgated on the parties' intent is not before the Court. In such a case, summary judgment is proper, *cf. Nafco Oil & Gas, Inc. v. Appleman,* 380 F.2d 323 (C.A.10, 1967).

The absence of express security or financing terms does not invalidate the agreement. The subsequent unavailability of financing and Longacre's return of the pickup after Stephens' injury has no effect on the conclusion that an agreement existed. Title 12A Okla.Stat. § 2–401 states as pertains to Seltzer's retention of the certificate of title and the lack of a financing statement:

"(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract . . . .. Any retention . . . of the title . . . in goods . . . delivered to the buyer is limited in effect to a reservation of a security interest. . . .

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . even though a document of title is to be delivered at a different time . . . ..

. . . . .

(4) A . . . refusal by the buyer to . . . retain the goods, whether or not justified . . . *revests the title to the goods in the seller.* . . ." (emphasis added)

Delivery of a certificate of title is not required to accomplish a change in ownership of a motor vehicle, *Starr v. Welch,* 323 P.2d 349 (Okl.1958).

After examination of the policy provisions in relation to the change of possession of the pickup, the conclusion is inescapable that the policy excludes coverage where possession is transferred pursuant to a sale, and that as a matter of law these facts do give rise to a sale or transfer of possession pursuant to sale, either of which is excluded from coverage. Longacre does not come within the ambit of the coverage and coverage thus cannot inure to Stephens' bene-

fit. This is the *ratio decidendi* of the case.

Accordingly, an appropriate Order will be filed this date.

## APPENDIX A

c. of Car _T351A_

Title to Trade *yes* ☐

Service Policy given to Customer & Card Signed ☐

*Tarros*

Net Payoff _____ Acct. No. _____

Additional Equipment Undercoat ☐ Premium Tires ☐

Other _____

_____ $ *1156.²⁰*

Total cost of Car $ *1050.8⁰*

Value of Trade *106* Commn.

*$26.50*

| | YES | NO | PCT. | PMT. ONLY | |
|---|---|---|---|---|---|
| Finance | ☑ | ☐ | | ☐ | $_____ |
| C.L. | ☑ | ☐ | | | _____ |
| A.H. | ☐ | ☐ | | | _____ |
| Coll. | ☐ | ☐ | | Full Term | _____ |
| P.L.&P.D. | ☐ | ☐ | | | _____ |

Remarks: _____

Approved: *Bill Tarros* _____ Total $ _____

APPENDIX B

Our File No. _____ LISTING BLANK

## INTERNATIONAL COLLECTION SERVICE
**910 N. W. 23RD**
**OKLAHOMA CITY, OKLA. 73106**

**OUR SERVICE A PROFESSIONAL TRUST"**

Date _____

Your Acct. No. _____

Creditor: _____

Debtor: _____ Wife _____

Last Charge _____ Balance _____

Residence _____

Employment _____

Wife Employment _____

References and Relative _____

_____

_____

Comments:

# APPENDIX C

## CUSTOMER'S STATEMENT

A filled-in handwritten "Customer's Statement" insurance/credit form. Legible entries include the applicant name "J. C. Longacre", Soc. Sec. No. "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", age "34", address "Box 333, Yukon, Okla", previous address "Box 276, Yukon, Okla", trade or occupation "Horse Shoeing & Trimming", bank "Yukon Nat'l Bank", and various other fields for operators, insurance coverage, and traffic violations. Form number "CMAC 130-0-8-68".

**RATING STATEMENTS — INDIVIDUALLY OWNED PRIVATE PASSENGER AUTOMOBILES**
(Including joint ownership by two or more relatives resident in the same household)

| | Non-Form Use | | Form Use | |
|---|---|---|---|---|
| | | Driver Training | | Driver Training |
| The first correct statement determines the Rating Class | Class | Class | Class | Class |
| There is an operator of the automobile who is: | | | | |
| An unmarried male under 21 and owner or principal operator... | 8A | 8AD | 8AF | 8AFD |
| An unmarried male 21 through 24 and owner or principal operator | 8B | — | 8BF | — |
| An unmarried male under 21 not owner or principal operator... | 7A | 7AD | 7AF | 7AFD |
| A married male under 21 ................................. | 6A | 6AD | 6AF | 6AFD |
| An unmarried male 25 through 29, and owner or principal operator | 8C | — | 8CF | — |
| A married male 21 through 24............................. | 6B | — | 6BF | — |
| An unmarried male 21 through 24 not owner or principal operator | 7B | — | 7BF | — |
| An unmarried female under 21... ....................... | 5A | 5AD | 5AF | 5AFD |
| **None of the above classes apply, and:** | | | | |
| There is business use of the automobile .................... | 9 | — | — | — |
| There is no business use of the automobile.................. | 4 | — | 4F | — |

**DEFINITIONS**

1. "OPERATOR" means the customer or any other operator of the automobile resident in the same household as the customer or who customarily operates the automobile
2. "MARRIED" means a married person living with a spouse and includes a person widowed, divorced or legally separated only if such person has custody of a child resident in the household
3. "BUSINESS USE" means that the use of the automobile is required by or is customarily involved in the duties of the customer or any other person customarily operating the automobile, in an occupation, profession or business other than use by clergymen or going to or from the principal place of occupation, profession or business.
4. "FARM USE" means that the automobile is principally garaged on a farm or ranch and is not customarily used in going to or from work other than farming or ranching and is not used in any occupation other than farming or ranching
5. "DRIVER TRAINING" means the automobile is rated on the basis that every male operator under 21 and every unmarried female operator under 21 has successfully completed an approved driver's education course
6. "RESIDENT" means anyone residing in the same household except that an individual in active military service with the Armed Forces of the United States of America shall not be considered a resident of the household unless such an individual customarily operates the automobile.

NOTE: "Chargeable Accident" means an accident while operating any private passenger type automobile resulting in damage to the automobile in excess of $100, except the following which are "non Chargeable", (a) Automobile lawfully parked, (b) Reimbursed by, or on behalf of, a person responsible for the accident or has a judgment against such person, (c) Struck by hit and run driver and reported to proper authority within 24 hours.

## DEALER'S WORK SHEET DATE _____

Car Sold — ☐ New ☐ Used — Year_____ No. Cyl_____ Make_____ Body Type_____ Model No._____
Check following equipment included in the Cash Sale Price.

| ☐ Radio | ☐ Automatic Trans | ☐ Power Steering | ☐ Power Windows | ☐ High Perf. Engine — Cu. In. Disp_____ H.P._____ |
|---|---|---|---|---|
| ☐ Tinted Glass | ☐ 4 Speed Trans | ☐ Power Brakes | ☐ Power Seats | ☐ Air Conditioning |

CASH SALE PRICE (Including Sales Tax, accessories or extra equipment, if any) . . . . . . . . . . . . . . . . . . $_____(1)★

 Gross Trade-In allowance $_____

 Pay-off on open account $_____ TRADE-

TOTAL DOWN PAYMENT — Net Trade-in allowance $_____ ★ $_____ ★ IN_____ _____(2)★
 (Cash) (Make) (Model) (Year)

UNPAID CASH PRICE BALANCE (Difference between Items 1 and 2) . . . . . . . . . . . . . . _____(3)★

COST OF CAR INSURANCE — RATING SYMBOL_____ AGE GROUP_____ COLL. DED. $_____ RATING CLASS_____ TERM OF INS._____ _____(4A)‡

COST OF THIRD PARTY AUTOMOBILE LIABILITY INSURANCE, IF ANY . . . . . . . . . . . . . . . . . . . . . . . . . . _____(4D)‡

OTHER COSTS — DESCRIBE_____ _____(5)★
(As defined in Item No. 5 of retail contract)

UNPAID BALANCE (Sum of Items 3, 4A, 4D and 5) [Suggest adjustment of Down Payment to eliminate cents in Unpaid Balance.] . . . . . . . . . . _____(5A)

CHARGE FOR CREDITOR LIFE INSURANCE, if any . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____(4B)

CHARGE FOR CREDITOR DISABILITY INSURANCE, if any . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____(4C)‡

PRINCIPAL BALANCE (Sum of Items 5A, 4B and 4C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____(6)★

FINANCE CHARGE (Difference Between Items 6 and 8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____(7)★

AMOUNT OF CONTRACT (Time Balance) Obtained from Payment Chart No._____ . . . . . . . . . . . . . . . . . . _____(8)★
 PAYABLE IN _____ INSTALMENTS OF $_____ EACH, (8A★) — (or as indicated on line below)

TOTAL TIME PRICE (Add Items 2 and 5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____(9)★

| | Unpaid Balance | Creditor Life Ins. | Creditor Disability Ins. | Principal Balance | Amount of Contract | Monthly Payments |
|---|---|---|---|---|---|---|
| Complete from payment charts if "Unpaid Balance" financed (Item 5A) requires the use of Adjustment Figures. | $_____ | $_____ | $_____ | $_____ | $_____ | $_____ |
| | _____ | _____ | _____ | _____ | _____ | _____ |
| TOTALS | $_____ | $_____ | $_____ | $_____ | $_____ | $_____ |
| Enter in corresponding spaces above ➤ | | (4B) | (4C) | (6) | (8) | (8A) |

### CARS FOR HIRE
★ Copy figures on contract

Will car be used as: ☐ Taxicab ☐ U-Drive ☐ Livery ☐ Other — Explain

### COMMERCIAL CARS AND TRUCKS

Contract Covers: — ☐ TRAILER — COST $_____ G.V.W._____
☐ CHASSIS ☐ CAB ☐ BODY ☐ TRUCK TYPE TRACTOR — COST $_____ ☐ SEMI-TRAILER — CAPACITY_____ TONS
Distance of Operation — ☐ Up to 50 miles ☐ Up to 150 miles ☐ Over 150 miles Use of Truck_____
 (State type of goods to be hauled)
Used Commercial Cars Only — Cost of car insurance based on (check which):
 ☐ Original Cost New (Complete Truck) $_____ ☐ List Price of Chassis ($_____) Plus ⅓rd $_____
 ☐ List Price of Chassis Plus Price New of Body $_____

COMMENTS_____

 DEALER'S
GMAC 150 D NAME_____

## APPENDIX D

## ADDITIONAL TERMS AND CONDITIONS

1. As used in this Order the terms (a) "Dealer" shall mean the authorized Dealer to whom this Order is addressed and who shall become a party hereto by its acceptance hereof, (b) "Purchaser" shall mean the party executing this Order as such on the face hereof and (c) "Manufacturer" shall mean the Division of General Motors Corporation that manufactured the vehicle or chassis, it being understood by Purchaser and Dealer that Dealer is in no respect the agent of Manufacturer, that Dealer and Purchaser are the sole parties to this Order and that reference to Manufacturer herein is for the purpose of explaining generally certain contractual relationships existing between Dealer and Manufacturer with respect to new motor vehicles.

2. Manufacturer has reserved the right to change the price to Dealer of new motor vehicles without notice. In the event the price to Dealer of new motor vehicles of the series and body type ordered hereunder is changed by Manufacturer prior to delivery of the new motor vehicle ordered hereunder to Purchaser. Dealer reserves the right to change the cash delivered price of such motor vehicle to Purchaser accordingly. If such cash delivered price is increased by Dealer Purchaser may, if dissatisfied therewith, cancel this Order, in which event if a used motor vehicle has been traded in as a part of the consideration for such new motor vehicle, such used motor vehicle shall be returned to Purchaser upon payment of a reasonable charge for storage and repairs (if any) or, if such used motor vehicle has been previously sold by Dealer, the amount received therefor, less a selling commission of 15% and any expense incurred in storing, insuring, conditioning or advertising said used motor vehicle for sale, shall be returned to Purchaser.

3. If the used motor vehicle which has been traded in as a part of the consideration for the motor vehicle ordered hereunder is not to be delivered to Dealer until delivery to Purchaser of such motor vehicle, the used motor vehicle shall be reappraised at that time and such reappraised value shall determine the allowance made for such used motor vehicle. If such reappraised value is lower than the original allowance therefor shown on the front of this Order, Purchaser may, if dissatisfied therewith, cancel this Order, provided, however, that such right to cancel is exercised prior to the delivery of the motor vehicle ordered hereunder to the Purchaser and surrender of the used motor vehicle to Dealer.

4. Purchaser agrees to deliver to Dealer satisfactory evidence of title to any used motor vehicle traded in as a part of the consideration for the motor vehicle ordered hereunder at the time of delivery of such used motor vehicle to Dealer. Purchaser warrants any such used motor vehicle to be his property free and clear of all liens and encumbrances except as otherwise noted herein.

5. Unless this Order shall have been cancelled by Purchaser under and in accordance with the provisions of paragraph 2 or 3 above, Dealer shall have the right, upon failure or refusal of Purchaser to accept delivery of the motor vehicle ordered hereunder and to comply with the terms of this Order, to retain as liquidated damages any cash deposit made by Purchaser, and, in the event a used motor vehicle has been traded in as a part of the consideration for the motor vehicle ordered hereunder, to sell such used motor vehicle and reimburse himself out of the proceeds of such sale for the expenses specified in paragraph 2 above and for such other expenses and losses as Dealer may incur or suffer as a result of such failure or refusal by Purchaser.

6. Manufacturer has reserved the right to change the design of any new motor vehicle, chassis, accessories or parts thereof at any time without notice and without obligation to make the same or any similar change upon any motor vehicle, chassis, accessories or parts thereof previously purchased by or shipped to Dealer or being manufactured or sold in accordance with Dealer's orders. Correspondingly, in the event of any such change by Manufacturer, Dealer shall have no obligation to Purchaser to make the same or any similar change in any motor vehicle, chassis, accessories or parts thereof covered by this Order either before or subsequent to delivery thereof to Purchaser.

7. Dealer shall not be liable for failure to deliver or delay in delivering the motor vehicle covered by this Order where such failure or delay is due, in whole or in part, to any cause beyond the control or without the fault or negligence of Dealer.

8. The price for the motor vehicle specified on the face of this Order includes reimbursement for Federal Excise taxes, but does not include sales taxes, use taxes or occupational taxes based on sales volume, (Federal, State or Local) unless expressly so stated. Purchaser assumes and agrees to pay, unless prohibited by law, any such sales, use or occupational taxes imposed on or applicable to the transaction covered by this Order, regardless of which party may have primary tax liability therefor.

9 If a charge for Creditor Life Insurance is included in this Order the provisions on Creditor Life Insurance in any retail instalment contract form subsequently executed between the parties hereto in conjunction with this Order shall be fully effective. If such insurance is unavailable or partly unavailable under the designated policy, the applicable portion of the charge for Creditor Life Insurance specified herein, and the finance charge thereon, may be deducted from the Total Time Balance and credited to the Purchaser. If such insurance does not become effective, notice thereof will be sent to the Purchaser by the Dealer and this Order and any retail instalment contract executed in conjunction therewith shall otherwise remain fully effective.

10. There are no warranties, expressed or implied, made by the seller herein, or the manufacturer, on the vehicle or chassis described on the face hereof except in the case of a new vehicle or chassis the General Motors printed new vehicle warranty delivered to purchaser with such vehicle or chassis and hereby made a part hereof as though fully set forth herein. The new vehicle warranty is the only warranty applicable to such new vehicle or chassis and is expressly in lieu of all other warranties, expressed or implied, including any implied warranty of merchantability or fitness for a particular purpose. In the case of a used vehicle or chassis, the applicability of an existing manufacturer's warranty thereon, if any, shall be determined solely by the terms of such warranty.

11. Any used motor vehicle sold to Purchaser by Dealer under this Order is sold at the time of delivery by Dealer without any guarantee or warranty, expressed or implied, including any implied warranty of merchantability or fitness for a particular purpose, as to its condition or the condition of any part thereof except as may be otherwise specifically provided in writing on the face of this Order or in a separate writing furnished to Purchaser by Dealer.

12. The Purchaser, before or at the time of delivery of the motor vehicle covered by this Order will execute such other forms of agreement or documents as may be required by the terms and conditions of payment indicated on the front of this Order.

**1278**

APPENDIX E

## DON PORTER
*Attorney at Law*

ZUI VILLA PROM · SHEPHLHU MALI
OKLAHOMA CITY, OKLAHOMA 73107
PHONE 341-7733

October 30, 1973

Mr. J. C. Longacre
414 Yukon Avenue
Yukon, Oklahoma

Re: Melvin Stephens vs.
J. C. Longacre

Dear Mr. Longacre:

This letter confirms our agreement whereby the Plaintiff, Melfin Stephens, by and through his attorney, agrees and binds himself to furnish you a release and Satisfaction of judgment which will be filed in your behalf at no cost to you in the above styled cause of action in the event that the plaintiff is unable to make any collection of the judgment in this case from Sentry Insurance Company and/or Seltzer Chevrolet.

Sincerely yours,

DON PORTER, Attorney

DP:gmj

---

## ORDER

This cause came on before the Court upon Motions for Summary Judgment, filed in the consolidated cases of Sentry Insurance Company and Melvin Stephens.

Based upon the rationale enunciated in the Supplement to Order, the Court is convinced of the propriety of rendering Summary Judgment for Sentry Insurance, and

It is, therefore, ordered, adjudged and decreed that the Motion for Summary Judgment of Melvin Stephens be, and the same is hereby denied, and that the Motion for Summary Judgment of Sentry Insurance Company be, and the same is hereby granted, and

It is further ordered, adjudged and decreed that there is no liability on the part of Sentry Insurance, a Mutual Company, to J. C. Longacre or Melvin Stephens, parties in this case.

## SUPPLEMENT TO ORDER

The Court has evaluated each Motion independently, has reviewed the plead-

ings and exhibits which are properly before the Court, and has determined that as to the genuine issues the material facts are not in dispute. All the inferences that can be drawn from the undisputed facts are both remote and are not meritorious of consideration. Therefore, the Court is convinced of the propriety of summary judgment being rendered.